### PHILADELPHIA & R. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. January 16, 1918.)

No. 2253.

1. APPEAL AND ERROR ⬿1010(1)—REVIEW—FINDING.

A finding of fact by the court sitting without a jury is, like a verdict, conclusive on an appellate court, if supported by competent evidence.

2. CARRIERS ⬿37—CARRIAGE OF LIVE STOCK—TWENTY-EIGHT HOUR LAW—VIOLATIONS.

Under the Twenty-Eight Hour Law (Act June 29, 1906, c. 3594, 34 Stat. 607 [Comp. St. 1916, §§ 8651–8654]), a railroad company which, knowing that its lines were congested and delays were imminent, took a chance when the margin of safety was small, in attempting to transport shipments of cattle through to their destination without unloading and feeding, must, the animals having been confined without rest, food, or water beyond the prescribed time before they reached the destination, be deemed to have knowingly and willfully violated the act, and so was liable for the penalty.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action by the United States against the Philadelphia & Reading Railway Company for penalty for confinement of cattle in violation of the Twenty-Eight Hour Law. There was a judgment for the United States (238 Fed. 428), and defendant brings error. Affirmed.

Wm. Clarke Mason, of Philadelphia, Pa., for plaintiff in error.
Robert J. Sterrett, Asst. U. S. Atty., of Philadelphia, Pa.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. Four suits, originally distinct, for violation of the Twenty-Eight Hour Law, were consolidated by agreement, and were submitted to the District Court without a jury. Three of the government's charges were sustained (238 Fed. 428), and are now before us on this writ; the fourth charge was dismissed, and will be disposed of in a separate opinion to be filed herewith. See 247 Fed. 469. All the facts were undisputed, and the only point involved in the case now being considered is whether the District Court had competent evidence before it to support its finding that the railway's violation of the statute was knowing and willful.

---

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[1] Such a finding is one of fact, and, like the verdict of a jury, binds a court of appeal, if it be supported by competent evidence. Nashville Ry. v. Barnum (C. C. A. 2) 212 Fed. 638, 129 C. C. A. 170; United States v. Fidelity Co., 236 U. S. 512, 35 Sup. Ct. 298, 59 L. Ed. 696. What, then, are the facts found by the court below? First, the following general findings, which are applicable to each of the three charges, viz.: That the statutory period expired while the animals were in the railway's possession and control; that the animals had neither rest, water, nor food during this period; that the railway's default was not excused by storm or other accidental or unavoidable cause, that could not have been anticipated or avoided by due diligence and foresight; and that the railway's default was knowing and willful. In the case of each shipment the period was 36 hours, but in other details the charges differ:

[2] No. 1. The animals were confined 30 minutes beyond the period. They left Pittsburgh at 11:50 a. m. on April 5, 1916, consigned to Philadelphia, and were received by the railway at Harrisburg (or Rutherford Yard, 3 miles further on) at 4:32 a. m. on April 6. This left 19 hours 18 minutes to complete the journey, but a delay of 4 hours 23 minutes occurred at Rutherford, leaving 14 hours 45 minutes for the run, which was the normal or average time. Rutherford was a feeding point, but the animals were not unloaded. They left Rutherford at 8:55 a. m. and reached Reading at 1:47 p. m. (4 hours 52 minutes), leaving 9 hours 53 minutes to reach Philadelphia. A further delay of 52 minutes occurred in Reading, reducing the margin to 9 hours 1 minute. Reading was also a feeding point, but no unloading took place. The normal running time to Philadelphia was 5 hours 40 minutes, so that, when the animals left Reading at 2:39 p. m. on April 6, there was an apparent leeway of about 3 hours 20 minutes before the 36 hours would expire. But there were delays on the road, and the animals were not unloaded until 12:20 a. m. on April 7, a half hour beyond the limit.

No. 2. The animals were confined 1 hour 20 minutes beyond the period. They left Buffalo at 6 p. m. on April 10, 1916, consigned to Philadelphia, and were received by the Railway at South Bethlehem at 10 p. m. on April 11. This left 8 hours to complete the journey, but at this point there was a delay of 2 hours 13 minutes, reducing the margin to 5 hours 47 minutes. South Bethlehem was a feeding point, but the animals were not unloaded. The normal time to Philadelphia was 6 hours 38 minutes, so that, when the shipment left South Bethlehem at 12:13 a. m. on April 12, it had 51 minutes less than the average time to reach its destination. It was still further delayed on the road, and the animals were not unloaded until 7:20 a. m., 1 hour 20 minutes beyond the limit.

No. 3. The animals were confined 50 minutes beyond the period. They left Buffalo at 5 p. m. on April 11, 1916, and were received by the railway at South Bethlehem at 7 p. m. on April 12. This left 10 hours to complete the journey, but at this point there was a delay of 2 hours 48 minutes, thus reducing the margin to 7 hours 12 minutes. South Bethlehem was a feeding point, but the animals were not unloaded. The average running time to Philadelphia is 6 hours 38 min-

utes, so that, when the shipment left South Bethlehem at 9:48 on April 12, the railway had an apparent margin of only 44 minutes. But a delay occurred at Tabor Junction, 2½ miles from the point of destination. Here the engine was detached and sent to move other cars (not a part of its own train) to a yard at Erie avenue. If conditions had been normal, the engine could have done this work, and could also have moved the animals to their destination, just within the statutory period. The yard was congested, however, the engine was delayed beyond the normal time for doing this extra work, and as a result the animals did not reach their destination until 5:50 a. m. on April 13, 50 minutes beyond the period. The Erie avenue yard had been congested for about two years, and of this fact the railway had full knowledge.

The only defense is that the violation of the act was not "willful," and the railway's only argument in this court is that the government offered no evidence to support a proper inference of such violation. In addition to the facts already set forth, the parties agreed that since before December, 1915, congestion had been general on all the railroads in the country, including the road of the Reading, and that such condition had been well known to the defendant. The delay in No. 1 was caused by this condition, and in No. 2 it was caused in part by this condition, and in part by the fact that the train carrying the animals was a local freight, and was obliged to switch out cars at several points along its route. The delay in No. 3 has already been explained.

The railway contends that its conceded knowledge of general conditions was not sufficient, but should have been supplemented by further evidence to the effect that before each shipment was sent out the railway knew specifically of conditions that would either certainly or probably delay that particular shipment, and contends, further, that the government offered no such evidence, and therefore that the court was not justified in drawing the inference of willful violation. We are unable to sustain this position. The general congestion affected the defendant's road, and, although no one could forecast precisely what kind of a situation might confront a particular train as it pursued its course, the railway's officials must have known that some difficulties, many of them unexpected, were continually arising, and that transportation was beset with hindrances and delays. We assume that the railway did its best to overcome every definite obstacle it could hear of in the path of each train now in question, but it could not foresee every contingency that was likely to arise. It did know, however, that serious congestion existed and was likely to cause unexpected delays, and this was a fact of which we think it was bound to take notice, and for which it was bound to make allowance. In every instance the risk of violating the law could have been avoided by feeding the animals before they started on the final stage of their journey, and if the railway, knowing that delays were likely to happen, chose to take the risk of getting the shipment through on time, we see no reason for relieving it from the consequences of failure. In our opinion there was evidence to support the finding of the District Court; the railway, with knowledge of the risk, encountered it deliberately, and this satisfies the requirements of the statute.

The judgment is affirmed.