UNITED STATES v. PHILADELPHIA & R. RY. CO.

(Circuit Court of Appeals, Third Circuit.  January 16, 1918.)

No. 2259.

CARRIERS ⊂⊃37—TRANSPORTATION OF LIVE STOCK—TWENTY-EIGHT HOUR LAW
     —VIOLATIONS.
     The Twenty-Eight Hour Law (Act June 29, 1906, c. 3594, 34 Stat. 607
     [Comp. St. 1916, §§ 8651–8654]), prohibiting carriers from confining live
     stock for more than 28 consecutive hours without rest, food, and water,
     but allowing the time to be extended by the shipper to 36 hours, declares
     that, in estimating the confinement, the time consumed in loading and
     unloading shall not be considered, but the time during which the
     animals have been confined without rest, food, or water on connecting
     roads shall be included; it being the intent of the act to prohibit their
     continuous confinement beyond 28 hours, save in the contingencies pro-
     vided.  A railroad company, knowing that the normal time for the trans-
     portation to the point of destination was slightly more than the time
     during which a shipment of live stock could lawfully be confined in cars
     without food, water, or rest, elected to attempt to transport the stock to
     the point of destination, instead of unloading them for food, etc.  The
     shipment arrived at the consignee's siding within time, and three of the
     cars were placed thereon and unloaded; but, the siding facilities being
     insufficient to accommodate the other two cars, they were not unloaded
     until 2½ hours later, the engine of the train meanwhile having departed
     on other business.  Held that, notwithstanding the failure of the rail-
     road company to deliver two of the cars was in part due to the re-
     stricted terminal facilities of the consignee, nevertheless, as the railroad
     company took a chance in continuing the confinement of the stock, know-
     ing that the margin of safety was very slight, and as the cars could not
     be unloaded until placed upon the siding, the company must, as to the
     two cars, the unloading of which was delayed, be deemed to have know-
     ingly and willfully confined the stock beyond the time allowed.

In Error to the District Court of the United States for the Eastern
District of Pennsylvania; Oliver B. Dickinson, Judge.

Action by the United States against the Philadelphia & Reading
Railway Company for violation of the Twenty-Eight Hour Law.
There was a judgment for defendant, and the United States brings er-
ror.  Reversed, with instructions.

See, also, 238 Fed. 428.

Robert J. Sterrett, of Philadelphia, Pa., for the United States.
Wm. Clarke Mason, of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit
Judges.

McPHERSON, Circuit Judge.  This case involves two cars of live
stock, and was heard and decided by the District Court at the same
time as the three cases we have just disposed of on the railway's writ
of error.  247 Fed. 466.

The undisputed facts show that the shipment included five cars,
three of which were placed on the consignee's siding at 6:20 a. m.,
February 16, 1916, so nearly within the 36 hours permitted by the
statute that the government claimed no penalty in respect of these.

The platform could only accommodate three cars, and the other two, while remaining coupled, were not placed where the stock could be unloaded. The engine left the five cars and went away to do work in a yard at some distance, but returned and moved the unloaded cars to the platform at 8:50 a. m., 2½ hours beyond the period. The engine's delay in returning was caused by the congested condition of the yard, and the railroad had previous knowledge of this condition.

In his supplemental opinion (not reported) the District Judge held that the railway had discharged its full duty when the five cars were put upon the consignee's siding, and of course he had no occasion to consider whether a "knowing and willful" violation of the act had been committed. He directed judgment in favor of the company, giving the following reasons:

"The cars * * * arrived at their destination in time, or so near it, that the United States disclaimed the thought of asking an imposition of the penalty for the mere excess. The failure to unload was due to the fact that the unloading facilities at the terminal siding of the consignee were insufficient. The train which had arrived was made up of five cars, for all of which there was not room at the unloading chute. So many as the siding would accommodate were put upon it and the cars unloaded. For these cars the United States asks no imposition of the penalty. It asks, however, that a distinction be made between the cars for which there was room and those for which there was not. The act of Congress is confined to cattle in transitu, and does not apply after the journey is at an end. To hold otherwise would be to make the carrier responsible for the terminal facilities of the consignee, or the ability of the consignee to handle the cattle after they had arrived. The contract and duty of the carrier were alike fulfilled when it brought the cars to the place of destination ready to be placed on the siding as soon as the consignee made room for them. If they were to go upon a siding, and could be there placed, the carriage would not be complete until they were so placed; but it was the duty of the consignee to receive, and therefore to be prepared to receive, and the obligation of the carrier had been met when it had the cattle there ready to be turned over to the care of the owner. This will necessitate a finding that the defendant is entitled to judgment for costs."

We are unable to agree with this conclusion. It is clear that the evil aimed at by the statute is the confinement of animals in excess of 28 or 36 hours (except in specified contingencies) without unloading for rest, water, and food. In positive language Congress declares that no railroad shall confine such animals for a longer period than 28 or 36 hours, and goes on to say that in estimating such confinement the time consumed in loading and unloading shall not be considered, adding still further:

"It being the intent of this act to prohibit their continuous confinement beyond the period of 28 [or 36] hours, except upon the contingencies hereinbefore cited."

Words could hardly be plainer; Congress had especially in mind the effect of confinement on the animals, and fixed a period that must not be 'exceeded, save for specified reasons. Unless, therefore, a railroad delivers the animals at a place where they can be unloaded—that is, where their confinement can be brought to an end—it has failed to discharge the duty imposed by the act, and if such failure has been knowing and willful it becomes liable to the statutory penalty.

In the case before us we think all the elements of the offense are present. The animals left Buffalo at 6 p. m. on February 14, consigned to Philadelphia, and were received by the Reading Railway at South Bethlehem at 9:30 p. m. on February 15, having been 27½ hours on the road. The time had been extended, however, and the railway still had 8½ hours to complete the carriage. At Bethlehem there was a delay of 3 hours and 10 minutes, so that the movement was not resumed until 12:40 a. m. on February 16. This left 5 hours and 20 minutes for the run to Philadelphia and as the normal time between these two points is 6 hours and 38 minutes it is clear that the railway took the chance of reaching Philadelphia in about 1 hour and 18 minutes less than the average time. In part, the chance fell out in the railroad's favor; for three of the cars were delivered and unloaded within, or practically within, 36 hours, and the animals in these cars were released from confinement. But the animals in the other cars were still confined; they could not be released until the cars could reach the platform, and to do this the engine must move them to the proper point. The cars had no facilities for food and water, and the platform might as well have been a mile away. Meanwhile the engine departed on other business, and when it returned and moved the cars to the proper place more than 38 hours had elapsed.

It seems to us that these facts admit of but one conclusion. South Bethlehem was a feeding point, where the command of the act could have been complied with, and we think the railway may properly be said to have violated the act knowingly and willfully when it sent the animals forward on the chance that they would complete the journey in less than the average running time. Certainly this conclusion would follow if the railway had been sure that the run could not be made within the statutory period, and we think the conclusion is also justified where the probabilities are against the company, as they were under the facts now presented, as stated herein and in the preceding case. No sufficient reason appears for taking such a chance. The animals could have been rested and fed at South Bethlehem, and all danger of violating the statute would thus have been avoided. As to three of the cars the railway was fortunate, but as to the other two the chance fell out against it, and it must accept the consequence. We do not decide that the railway should have unloaded the cars within the period; our decision is that the cars should have been placed where they could have been unloaded.

The judgment is reversed, with instructions to enter a judgment in favor of the government.