## McCAUGHN v. ELECTRIC STORAGE BATTERY CO.

### No. 4752.

Circuit Court of Appeals, Third Circuit.

Jan. 31, 1933.

BUFFINGTON, Circuit Judge, dissenting.

Edward W. Wells, U. S. Atty., and T. J. Curtin, Asst. U. S. Atty., both of Philadelphia, Pa. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and E. F. McMahon, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for appellant.

Charles C. Norris, Jr., Philip Dechert, Wm. Barclay Lex, and Charles J. Hepburn, all of Philadelphia, Pa., for appellee.

Before BUFFINGTON and DAVIS, Circuit Judges, and NIELDS, District Judge.

DAVIS, Circuit Judge.

This is an appeal from a judgment of the District Court holding that the tax was illegally levied, assessed, and collected on the batteries made and sold by the appellee by virtue of section 900 of the Revenue Acts of 1918 and 1921, 40 Stat. 1122, 42 Stat. 291. This section provides:

"That there shall be levied, assessed, col-

lected, and paid upon the following articles sold or leased by the manufacturer, producer, or importer, a tax equivalent to the following percentages of the price for which so sold or leased—

"(1) Automobile trucks and automobile wagons, (including tires, inner tubes, parts, and accessories therefor, sold on or in connection therewith or with the sale thereof), 3 per centum;

"(2) Other automobiles and motorcycles, (including tires, inner tubes, parts, and accessories therefor, sold on or in connection therewith or with the sale thereof), except tractors, 5 per centum;

"(3) Tires, inner tubes, parts, or accessories, for any of the articles enumerated in subdivision (1) or (2), sold to any person other than a manufacturer or producer of any of the articles enumerated in subdivision (1) or (2), 5 per centum."

The appellee made and sold to persons other than the manufacturer or producer of automobiles batteries, some of which were used in automobiles and others were used otherwise, and the question is whether or not these batteries were "parts" or "accessories" of the vehicles mentioned in subdivisions (1) and (2) of the above section within the meaning of subdivision (3) thereof.

Subdivisions (1) and (2) contemplate that the parts and accessories mentioned therein will be sold with the vehicle by its manufacturer, and, where this is done, the tax is paid by him. In subdivision (3) it is contemplated that the parts and accessories will be sold separately from the vehicle by their manufacturer and the tax is to be paid by the manufacturer of the parts and accessories.

Articles *primarily* adapted for use in motor vehicles and not equally adapted to *other uses* are to be regarded as parts and accessories within the meaning of subdivision (3), quoted above. Universal Battery Co. v. United States, 281 U. S. 580, 50 S. Ct. 422, 74 L. Ed. 1051.

Were the batteries in question, on which the tax was levied and paid, primarily adapted for use in motor vehicles and not equally adapted to other uses for which they were made, advertised, and sold?

The learned trial judge found that, "as to the specific articles upon the sale of which the taxes were imposed, beyond the fact that they were electric storage batteries there is no evidence as to their characteristics or what they were ultimately used for." He further expressly found:

"3. That the parts of the electric storage batteries upon which the taxes in suit were paid were exactly the same as the parts of the storage batteries manufactured by the plaintiff in 1893 or 1894, and the only changes in the parts themselves are the changes naturally due to the refinement in art of manufacturers developed during that period and to competition in price. None of these refinements made the batteries peculiarly adapted to use on automobiles, but they continued to be equally adapted to use on any device where the duty requirements were the same.

"4. That the uses of electric storage batteries manufactured by the plaintiff and upon which the taxes were paid, other than the use on automobiles, were not incidental to the use of automobiles.

"5. That the storage batteries manufactured by the plaintiff, and upon which the taxes in suit were paid, were not peculiarly adapted only to automobiles, but were equally well adapted to use in stationary engines and marine engines, and for other purposes where the duty required was the same, and were so used.

"6. That the storage batteries manufactured by the plaintiff, and upon which the taxes in suit were paid, were not primarily adapted to use only on automobiles.

"7. That the storage batteries manufactured by the plaintiff, and upon which the taxes in suit were paid, were interchangeable for use in connection with automobiles or for use in connection with other devices where the duty requirements were the same.

"8. That the storage batteries manufactured by the plaintiff, and upon which the taxes in suit were paid, were widely and extensively advertised for purposes other than for use on automobiles.

"9. The duty required of storage batteries for use in automobiles was also required in other uses and the batteries which were applied to these other uses were identical in design with the batteries used in connection with automobiles."

These findings, if supported by the evidence, are, under the law, declared in the case of Universal Battery Company v. United States, supra, decisive of this case.

The first question, therefore, is whether or not these findings are supported by the evidence.

The electric storage battery long antedated the automobile. About this there is no dispute, and so it cannot be said that these batteries, as such, were primarily adapted to

automobile use as regards time. The word "primary" means, "in the first order of time; original; first in the order of development." It also means "first in rank; dignity or importance; chief; principal." Webster's New International Dictionary. It is true that the testimony shows that certain batteries were used for certain types of cars, but this is because they were of the size which best suited the needs of that particular motor or the size of the battery fitted the box or space in that particular car.

But the testimony unequivocally shows that any one of these batteries would be equally applicable to any other use where the requirements of the circuit were the same, and there are many circuits whose requirements are the same as those of automobiles. These requirements are supplied by the electric storage batteries of the appellee. The electric storage battery was used for starting internal combustion engines before it was used in the automobile. These same batteries which are adapted to, and used in, automobiles, are also used for starting and lighting motorboats, "for starting the engine and for lighting the boat and for ignition." Identically the same battery is used on an automobile as on a boat. These same batteries are still used on internal combustion engines and also on road rollers, road graders, and on tractors. In other words, there is nothing peculiar in the use of an electric storage battery on an automobile. It performs or may perform the same functions there that it does in many other uses to which it is put. It is argued that because some of these batteries are made of a size and strength required for a particular type of automobile, they are "primarily adapted for use in the automobile," but assuming, without admitting, that they are, then in order to be taxable under the case of Universal Battery Company, supra, they must not be equally adapted to any one of the other many uses to which they are put. In other words, they may be primarily adapted to use and be used on automobiles, but, to be taxable under this act, they must not be equally adapted to other uses, but the testimony is positive that they are equally well adapted to many other uses.

[3, 4] The fact that automobiles are the largest users of storage batteries is not decisive of the case. That they are the largest users is a fact, but taxability of a battery under this statute depends, not upon the quantity used, but upon whether or not it is primarily adapted for use in an automobile and not equally adapted to any other use requiring the same load. Unless it fulfills these two require-

ments, it is not a "part or accessory" within the meaning of this statute. Judge Kirkpatrick, who saw the witnesses and heard all the testimony, has expressly found it is not and the testimony, fairly interpreted, as a whole and not fragmentarily, abundantly supports his findings. These findings, being supported by the evidence, are, under the facts of this case, conclusive upon us. Philadelphia & Reading R. Company v. United States (C. C. A.) 247 F. 466; Dooley v. Pease, 180 U. S. 126, 21 S. Ct. 329, 45 L. Ed. 457; United States v. United States Fidelity & Guaranty Co., 236 U. S. 512, 35 S. Ct. 298, 59 L. Ed. 696.

Is recovery barred by section 424 (a) of the Revenue Act of 1928 (26 USCA § 2424) which provides that:

"No refund shall be made of any amount * * * collected from any manufacturer [of parts for automobiles] * * * unless either—

"(1) Pursuant to a judgment of a court in an action duly begun prior to April 30, 1928; or

"(2) It is established to the satisfaction of the Commissioner that such amount was in excess of the amount properly payable upon the sale or lease of an article subject to tax, or that such amount was not collected, directly or indirectly, from the purchaser or lessee, or that such amount, although collected from the purchaser or lessee was returned to him; or

"(3) The Commissioner certifies to the proper disbursing officer that such manufac· turer, * * * has filed * * * a bond * * * conditioned upon the immediate repayment to the United States of such portion of the amount refunded as is not distributed by such manufacturer, * * * within six months after the date of the payment of the refund to the persons who purchased * * * the articles in respect of which the refund is made. * * * *"

It is argued that plaintiff cannot recover because the action which resulted in the judgment was not begun prior to April 30, 1928. This act refers to a refund of taxes by the Commissioner and not to a right of action by the taxpayer to recover taxes paid. If judgment was obtained against the collector in an action begun prior to April 30, 1928, then refund may be made by the Commissioner out of the proper appropriation from the Treasury in accordance with the provision of section 989 of the Revised Statutes (28 USCA § 842). If the suit was not begun before April 30, 1928, then refund may be made by

the Commissioner, without the intervention of a court, in accordance with the provisions of subdivisions (2) and (3) of the act. This section clearly refers to a "refund" of taxes by the Commissioner, and nowhere refers to the plaintiff's right of action to recover taxes by litigation nor to the jurisdiction of the court. In other words, this section is an administrative measure for the guidance of the Commissioner in the "refund" of taxes, and does not purport to contain any provision prescribing conditions under which taxes may be collected by means of a suit.

Accordingly, recovery is not barred by this section, and the judgment should be affirmed.

BUFFINGTON, Circuit Judge (dissenting).

This case involves the question of tax on storage batteries made and sold by the Electric Storage Battery Company. Such tax was assessed by the Commissioner, and, for present purposes, I assume was paid under protest. On suit against the collector to recover such tax, the court below entered judgment for the taxpayer for such tax of $973,532.57 and interest thereon, $443,034.24. Whereupon this appeal was taken.

By section 900 of the Revenue Act of 1921, 42 Stat. 291, which makes automobiles a special subject of taxation, Congress provided by subdivision (3) of such act for a tax on " * * * parts, or accessories for any of the articles enumerated in subdivision (1) or (2), * * * 5 per centum." By subdivision (3) of section 600 of the Revenue Act of 1924 (26 USCA § 881 note), this tax was reduced to 2½ per centum. The taxes here involved covered storage batteries made between June, 1922, and February, 1926.

The tax having been paid, the taxpayer made a claim for refund. After proofs and hearing, the Commissioner, on January 7, 1927, decided: "The claim is based upon the contention that the batteries on which this tax was paid were not automobile parts, but well-recognized commercial commodities. * * * Since the storage batteries on which this tax was paid were primarily adapted for and were used on automobiles, these articles are considered automobile parts and are properly subject to tax as such under section 900 of the Revenue Act of 1921 and section 600 of the Revenue Act of 1924. Since this tax has been properly paid, the claim is rejected." In this situation, viz. with the refund claim decided adversely and with no suit brought against the collector, the matter remained until June 28, 1928.

Now, by section 424 (a) of the Revenue Act of 1928 (26 USCA § 2424), which it will be noted applied specially to taxes imposed by sections 900 and 600, already quoted, Congress provided:

(a) "No refund shall be made of any amount paid by or collected from any manufacturer, producer, or importer in respect of the tax imposed by subdivision (3) of section 600 of the Revenue Act of 1924, or subdivision (3) of section 900 of the Revenue Act of 1921 or of the Revenue Act of 1918, unless either—

"(1) Pursuant to a judgment of a court in an action duly begun prior to April 30, 1928; or

"(2) It is established to the satisfaction of the Commissioner that such amount was in excess of the amount properly payable upon the sale or lease of an article subject to tax."

Seeing then that Congress had in view the particular statutes imposing taxes on automobiles and the parts thereof, and that this section 424 expressly recited such prior acts, the language of such section 424 is unambiguous, and there can be no doubt that its purpose was that thereafter there should be no refunds of such taxes, except in two instances, one where there was a judgment of a court in an action begun prior to April 30, 1928 (which is not the case here, the present suit having been brought June 28, 1928), and the second instance where "it is established to the satisfaction of the Commissioner that such amount was in excess of the amount properly payable," etc., which action by the Commissioner has not been invoked by the present taxpayer. In construing this statute, I may take judicial notice that the refund of taxes has been a matter of criticism. The sovereign power had conceded the right to sue for taxes alleged to have been illegally collected, and such right taxpayers generally have, but for its own reasons Congress followed another course with reference to automobile taxes, and that was to limit recovery by suit to actions brought before April 28, 1928, but in all other cases make the Commissioner the arbiter and thus make him responsible for any refunds made. Such delegation of power was clearly within the power of Congress to make, and such centering of responsibility upon one officer was a wise provision to prevent criticism. And, in furtherance of preventing undue refunds, I do not shut my eyes to the fact that, in actions to recover back for taxes collected, where the matter is left to a jury with no responsibility and immune from criticism, Congress might wisely do as it did, namely, limit its liability on suit for these automobile

taxes to actions begun before a certain date. As I view the reason and spirit of the law and its express, unambiguous language, I am clear that Congress so intended. To hold otherwise is to overlook what Congress said and resort to surmise. Nor is any injustice done by such holding. On January 7, 1927, the Commissioner denied the taxpayer's claim for refund. It was then open to such taxpayer to bring suit. That right remained opened to him from then to April 30, 1928. No advantage was taken by the taxpayer in litigating such right, and it cannot be contended that the statute was unjust and arbitrary which withdrew the sovereign's consent to be sued. In naming one class of timely suits and saying that such timely suits could enforce refunding, did not the mention of such specified class exclude all others? Is the construction of this statute to do away with the recognized interpreting rule that mention of one is the exclusion of others? When the statute says one class of suits, viz. those brought before April 30, 1928, shall have a certain effect, should a court hold that its intent was that all suits brought after such date should have the same status as ones brought before such date? And what difference in effect can they have save that those of the allowed date shall effect refund and those of later date shall not? Unless the statute is given that meaning, what does it mean?

So regarding, it seems clear to me that, this suit being brought subsequent to the statutory date, the court below had no power to litigate the plaintiff's claim and should have dismissed the action. But, assuming the court had jurisdiction, how stands the case? The Commissioner found as a fact that "the storage batteries on which this tax was paid were primarily adapted for, and were used on, automobiles." He further found "these articles are considered automobile parts." The burden of proving such was not the fact was upon the taxpayer. U. S. v. Anderson, 269 U. S. 422, 46 S. Ct. 131, 70 L. Ed. 347. To do this it was necessary for the taxpayer to show by the weight of the evidence, first, that the storage batteries were not primarily adapted for use on automobiles; and, secondly, if so adapted, that they were in point of fact not used on automobiles. Simply stated, these are the two fact issues in the case. Did the taxpayer, by the weight of the evidence, establish these facts?

Addressing myself to the first question, I note that a great mass of irrelevant testimony has found a place in this record and in discussions thereof. A storage battery is, as its name indicates, a storer or container of electric power. Such being the case, when such electric power is released, it vents that power in any mechanism or relation on which it is brought to bear exactly as electricity does whether stored or free. It follows, therefore, that, because such stored electricity can be used for any and every use incident to electricity of that power and volume, it does not follow that, because the electricity so freed could be used for these many purposes, the equipment in which it was stored was not primarily adapted for use on automobiles. The tax is not laid on electric current; it is not laid on the use of such current. The tax is laid on a box and mechanism adapted for electric storage use on automobiles. Far from proving its batteries were not primarily adapted for use on automobiles, the proof is clear that each of the storage batteries in question was specially designed, made, and marketed, not for use on all automobiles, but for use on a particular model of a particular year, of a particular maker; that each of these thus individualized batteries was designated by a telegraphic code, so that, if not kept on hand by any one of the numerous distributing agents the taxpayer maintained along lines of travel or by any dealer who dealt in storage batteries for automobiles, such distributor or dealer could by telegraph to the taxpayer designate, and have promptly furnished for a purchaser, the identical storage battery which the taxpayer had made for use, when called for, on such particular car as the buyer had.

From the proofs it appears the Electric Storage Battery Company, the taxpayer, had for a number of years made storage batteries adapted to be used for many purposes. A witness cites eighteen uses, running from railway signaling to the load regulation of electric railways. And, referring to such like use on automobiles, he testifies "there was no difference where the duty required was alike."

When the automobile came, such batteries were used for two purposes only, viz. lighting and ignition. In 1911 Dr. Kettering showed such electric power could be used as a starter for automobiles, and a new and heavy load was thus laid on the storage battery. In that regard the proof is that "the lighting current is considerably lower in amperage than the starting current. * * * The starting current required is a much heavier current. * * * A battery used for starting an automobile would naturally be made with larger plate area. * * * Because the amperage required for starting is greater than the amperage required for light-

ing." As this same witness testified, the area of the plates "would be determined by the requirements of the load," and, when starting, lighting, and ignition were all pulling at the same time on the same battery, the load duty of a battery would be the sum of all three and the area of the plates would be determined by the requirements of the battery duty. But not only does the starter element of the automobile storage battery differentiate it from the storage battery in common commercial use, but the plate area of different automobiles necessarily varies in different makes of automobiles. In this respect the proof as to batteries is, "they vary quite a little in different makes of cars. * * * The capacity varies to some extent with the size and weight of the car, the size of the engine. * * * We have a good many types of batteries that are used on automobiles. If a man asked for an automobile battery, we wouldn't know what to tell him to select without knowing a little more about the requirements of his automobile." Dr. Kettering went to the taxpayer "to get a battery suitable as a starter. He selected twenty-four volts as the requirement of his starter. They suggested the type of battery in use for railway signalling and selected twelve cells of the three plate S type. These twelve cells were assembled in a wooden box of the type and size suitable to be fastened to the running board of an automobile. Dr. Kettering continued his experiments and that battery was finally brought out on the 1912 Cadillac car. * * * This electric starter was the first really successful device for automobile engines and also not only for automobile engines but the same thing was used almost immediately for motor boats and also for internal combustion machines."

But not only was the electric duty required for each type of automobile different, but the shape, dimensions, and cubical area of the container were different in each type of automobile. The individual character of each storage battery for each model of an automobile is shown by the proofs: "When the manufacturer of the car gave the storage battery manufacturer the duty required, a battery was selected which would perform that duty, and thereafter the manufacturer of the car provided a space which would take a battery of that size, and therefore subsequent replacement batteries would naturally be of the size to replace the battery which was original equipment."

Another witness who dealt in taxpayer's batteries testified as to the practice in supplying customers as follows:

"Q. Now, Mr. Hawkins, supposing one of your customers should call you on the telephone and ask for a storage battery, would you know what to supply them with? A. I would first ask him what type of car and what model of car; after obtaining that information I would next ask him how long he intended to keep his car, for the reason that we have several types of batteries of the same size that will answer his purpose, but if he is only going to have the car for a short time we would sell him the least expensive battery. If he was going to keep it two or more years we would try to sell him the best grade of battery, which would give him two or more years of service.

"Q. And supposing, supposing your customer called you on the telephone and asked to buy a battery, storage battery for his automobile, would you know what to furnish him? A. Not until I got the definite information of what he wanted.

"Q. I see, and why was it necessary to get that definite information? A. Because there are so many—the different cars take different sized batteries, and if we found out that he had a Ford or a Chevrolet, that takes the one size. If he had a large Buick, or a Studebaker, that takes another size, and if he had a Pierce-Arrow, Cadillac or La Salle, that takes another size, and so on through, so that to do the job intelligently you must know what he has, the model of the car, to furnish the battery of the correct type that will give him the proper service."

It will thus be seen that the batteries furnished to the manufacturer to use in his car were especially designed by an engineer of the taxpayer, and the auto manufacturer built his car so as to afford space for that particular battery, or, as the witness said of the automobile manufacturers, "they suited the automobile to the battery, you might say."

A particular type and strength of battery being adapted to each particular model of automobile, it will at once be seen that, when starter storage batteries came into use in automobiles, a large field for battery replacement opened up to the taxpayer. That the original storage battery furnished to the manufacturer when his car was built was a "part" of such car, indeed the most vital part, goes without saying. Indeed, it was "the part" par excellence. The other parts of the car, the gas tank, the wheels, the spark plug, were all powerless without the storage battery. It follows, therefore, that, when this all-important part of the car wore out, the replacement storage battery was likewise a part and aptly described as such in the statute here involved.

Now this replacement market of particular storage batteries for particular cars became a large factor in the taxpayer's business. In the first place, as we have seen, it designated by telegraphic code its individual batteries which could be used for replacements on cars of different specified manufacturers. It gave a list of four hundred and sixty-one models of cars made by two hundred and seven different manufacturers, in which storage batteries of its competitors had been originally installed, and gave the particular storage battery of its own make which the car owner could use to replace its competitor's battery. Indeed, the catalogues of the taxpayer show that they were prepared with a view to securing the automobile replacement trade. The taxpayer's success in that line can be seen from the fact that, figuring on the basis of the 2½ per cent. on the business found by the Commissioner to have been used on automobiles, the taxpayer realized a profit of over three millions of dollars. While these batteries, specially designed for automobile use, could also be used on motorboats, the taxpayer's chief engineer stated "that the number (motorboats) as compared with the number on automobiles is small," a fact of which judicial notice might well be taken from the patent fact of the millions of automobiles in use compared with the small number of motorboats seen. Indeed, it is quite evident that the automobile trade was the prime and all-important market for which the taxpayer designed its automobile storage batteries, that it aggressively entered that market, maintained hundreds of distributing stations along automobile highways. Indeed, the proofs furnished by the taxpayer itself justify the conclusion, found by the Commissioner, that "the storage batteries on which this tax was paid were primarily adapted for use and were used on automobiles."

It is sought to avoid tax on these batteries because they can be used for other uses than the automobile one for which they were primarily designed, made, and sold. For example, the taxpayer produces the evidence of Carroll Hodge, the manager of its construction department, that the storage battery on his car "was taken off that one Sunday and taken across the road to the church, where the generator of the pipe organ had gone out of commission, so that the pipe organ would not work, and the battery ran the pipe organ, the electric action of it, for the matter of three months before the generator was fixed up." The testimony of a dealer was that he sold for use in a radio storage batteries fitted for use on automobiles. What use was made in a church organ or in a radio of the starter capacity of an automobile storage battery does not appear. But we do know that, save in an emergency or exceptional case, no one would think of buying a new automobile storage battery for more dollars when an ordinary storage battery without starter power would cost less, or, as one of the taxpayer's dealers testified, "you would be wasting money to buy the automobile types for some of the other installations." A dealer proved automobile storage batteries were sometimes rented for telephone purposes; when current was needed at an entertainment; for exploding dynamite in blasting; a battery from a Studebaker automobile hearse was taken off and used in a radio set; once when needed for an emergency pump in a borough water works. Of old ones, he says, "We repaired them and used them for rental batteries, for rental batteries and radios and most anything that a battery could be used for." This witness dealt in the taxpayer's storage batteries. He said the greater portion of his business was sales for use on automobiles, and he could not form any idea of what proportion were sold for other uses. The sales for radio sets, as explained by the witness, was that in the radio craft, when men were themselves building radios, the secondhand storage batteries taken from cars were sold to these men building their own radios. It will thus be seen that the use of these automobile storage batteries for other uses was for the large part secondhand and for exceptional emergency uses. This is explained by a witness, who sold nothing but the taxpayer's batteries, as follows:

"Well in the case of an emergency an automobile battery can be used, a battery used commonly in an automobile can be used to answer most any purpose, not permanently, just for an emergency; for instance, that on several occasions where the Bell Telephone Company in the outlying districts has burned down, I have been called upon to furnish batteries that would take care of their requirements on the emergency telephone switchboards that they would install until a permanent board could be erected, and in those cases I would take the heaviest types of automobile batteries and make up enough of them, or at least furnish enough of them so as to give them the proper amount of current to run their switchboards with until the permanent installation could be made.

"Q. And were those the batteries of the plaintiff, the Electric Storage Battery Company? A. The majority of them were. In these instances I would have to select the big-

gest batteries out of the service batteries I carried in stock, for instance, the batteries that would be used in the Cadillacs, Pierce-Arrows, and only the heavy batteries would really answer the purpose. * * * Why, I have one instance which I can remember of which we have taken a battery out of an electric vehicle. The vehicle was damaged, and to such an extent the owner did not care to repair it. It had a set of batteries in it. which were in good condition. I took those batteries out and installed them on a 110 volt lighting plant that is owned and operated by the Beaver Run Hunting and Fishing Club in Pike County, Pennsylvania, but there were not a sufficient number of batteries that came out of this electric vehicle, if I remember correctly there was about forty cells, to have 110 volts, which they required at this club. I bought additional vehicle batteries to make up the one hundred and ten volts, and the system is now running as a one hundred and ten volt lighting plant, using the Koehler 1500 watt generator, which is cranked by two twelve-volt batteries similar to what is used in a Dodge car."

He adds: "My experience has been mostly of using service batteries for emergency purposes, where it will answer the purpose, but when the installation is made they adopt a different type of battery." Speaking of using them for telephone service, he says: "They used to call on me knowing that I had a couple of hundred batteries in stock at all times and they really relied upon me furnishing them with emergency batteries, until they had batteries of their own for that purpose." Indeed, that the batteries for automobiles here in question were developed by the automobile, were designed for automobiles, and were used by automobiles is shown by a witness for the taxpayer who says:

"Q. Mr. Vinal, while these batteries were discussed here, that may have been used for other purposes than on or in connection with automobiles, is it not true that the big stimulus in their development has been the application of these batteries to starting and lighting service on automobiles, and that the fact that a convenient and portable type of battery was developed in response to the stimulus of the automotive trade has resulted in their being diverted to other uses? A. I believe that that is true. * * *

"Q. Can you tell us, Doctor, whether or not the rapid development of the automobile was a big factor of stimulus in the development of electric storage batteries? A. I believe that it was."

From these proofs and others that might be added it is clear to me that the storage batteries here taxed were, as the Commissioner found, primarily designed, made, and sold for use as replacement parts of automobiles, and, while they were capable of use and were in particular instances used secondhand for other purposes, they were in fact primarily made for automobiles, were so used, large profits made therefrom, and they therefore were justly called on to contribute to the tax paying help of government. For the two cited reasons I feel the court committed error in entering judgment for the taxpayer, and the judgment should be reversed.