FRIEDMAN TEXTILE COMPANY, Inc., a Corporation (Plaintiff), Respondent,

v.

NORTHLAND SHOPPING CENTER, INC., a Corporation, and Northland Libson Shops, Inc., a Corporation (Defendants), Appellants.

Nos. 30001, 30002.

St. Louis Court of Appeals.

Missouri.

Feb. 17, 1959.

Motion for Rehearing or for Transfer to Supreme Court Denied March 13, 1959.

Lewis, Rice, Tucker, Allen & Chubb, Joseph W. Lewis, Herbert A. Mack and Sigoloff & Sigoloff, J. E. Sigoloff, St. Louis, for appellants.

Husch, Eppenberger, Donohue, Elson & Jones, Carroll J. Donohue, and Shulamith Simon, Schwartz, Schwartz & Landsman, Burnett Schwartz, St. Louis, for respondent.

DOERNER, Commissioner.

This is an appeal by both defendants from a judgment and decree of the Circuit Court of the City of St. Louis granting plaintiff certain injunctive relief and a monetary judgment for actual and punitive damages. In the interests of convenience and clarity the parties will be referred to in the following manner: Friedman Textile Company, Inc., as plaintiff; defendant Northland Shopping Center, Inc., as defendant Northland; and defendant Northland Libson Shops, Inc. as defendant Libson.

Defendant Northland owns and, through its managing agent, G. F. Nooney and Co., manages the largest shopping center in the St. Louis area, situated on a 60-acre tract on Lucas and Hunt Road and West Florissant Road in the City of Jennings, St. Louis County, Missouri. Three buildings form a north and south line stretching across the middle of the area. The center building is designated as building "A", the one to the south as building "C", and that to the north as building "B". A fourth building, called "D", runs westwardly from the northwest corner of building "B", to form an "L" therewith; and a fifth, termed "E", is independently situated some distance north of building "D". Because of the terrain, buildings "B" and "C" have an upper and a lower level, occupied on both levels by stores and shops. Famous-Barr Co., operated by May Department Stores Co., occupies all of building "A", and 42 various other retail businesses are operated in the remaining four buildings.

While the shopping center was in the planning stage, plaintiff, in May of 1954, contacted defendant Northland with the object of negotiating a lease for a children's department store. Numerous conferences occurred between that date, culminating in a lease dated November 9, 1954, which by mutual consent was superseded by the lease here in question, dated December 16, 1954. By the terms of the present lease defendant Northland leased to plaintiff a store on the upper level of building "C" for a term of ten years, at a yearly minimum rental of $13,612 per year, plus 5% of plaintiff's gross anual sales in excess of $272,240 as additional rent. Paragraph 5 of the lease provided:

"Lessee covenants and agrees that it will use the Demised Premises continuously throughout the term hereof for the purpose of conducting therein the following business or businesses, namely: A children's store defined in Lease Rider No. 1 attached hereto and made a part hereof * * *."

Lease Rider No. 1, thus referred to, read:

"In keeping with the overall plan for a well-balanced shopping center, Lessor agrees that during the term of this lease, except as hereinafter otherwise provided, it will not lease to any other person, firm or corporation any space on the upper level of Building 'B' or 'C' of Northland Shopping Center for use as a children's store. 'Children's Store' shall be construed as the type of store engaged primarily in handling and offering for sale children's merchandise including but not limited to clothing, shoes, furniture, toys and accessories.

"Notwithstanding the above restriction, it is understood and agreed that Lessor may lease an area of approximately 1300 square feet in the upper level of Building 'B' for a children's store, as above defined and one additional store on the lower level in Building 'B' or in Building 'D' for a 'children's store' as above defined.

"Also notwithstanding the above provisions and restrictions, it is agreed that the leasing of stores carrying a full line of children's toys and items closely associated thereto, and stores described as 'Children's Shoe Stores' shall not constitute violations of this Rider."

The space leased to plaintiff is "L" shaped, the longer leg of the "L" consisting of an area approximately 27 feet wide and 135 deep and the smaller leg of an area approximately 27 feet wide by 54 feet deep.

On December 2, 1954, defendant Libson entered into a lease with defendant Northland for a store on the upper level of building "C" measuring approximately 36 feet wide by 126 feet deep, for a term of fifteen years, at a minimum rental of $10,530 per year plus a percentage rent of 5% of gross sales in excess of $210,600 per year. The use clause provided that the demised premises were to be used "* * * for the purpose of conducting therein the following business or businesses, namely: Misses, Junior, and Women's apparel and accessories * * *." The store thus leased by defendant Libson was immediately adjacent to, and to the south of, the store leased to plaintiff. One other shop intervened between plaintiff's shop and Famous-Barr.

The shopping center officially opened on August 19, 1955, at which time plaintiff, Famous-Barr, and a few other enterprises commenced to do business. Defendant Libson opened its store shortly thereafter. Plaintiff's merchandise included a complete line of girls' and boys' wearing apparel, from infants to the 12–13 age group for girls and from infants to the 12–14 age group for boys. Small items of toys and accessories were also sold by plaintiff. For about a year after it opened its store, defendant Libson sold only junior, misses and women's wearing apparel, including hosiery, lingerie, foundations, dresses, sportswear and accessories, beginning at the age of 15 years and up.

Defendant Libson is corporately related to Libson's Shops, Inc., which operated 13 other shops in the St. Louis area, all of which sold misses, junior, and women's apparel and accessories. In 1950 or 1951 the Libson Store in Maplewood, Missouri added a line of children's wear, as a pilot project, Libson's Shops, Inc., having then decided that if the experiment proved profitable a similar line would be added to such other Libson Stores as had room to accommodate it. In 1956 the Libson interests decided to add the line of children's wear to three additional stores, including the shop operated by defendant Libson at the Northland Shopping Center. Late in June 1956, Harry Lieberman, presi-

dent of defendant Libson, contacted Elmer L. Helm, an employee of defendant Northland, who had handled much of the negotiations connected with the leasing of the various stores in the shopping center. Lieberman testified that when he first talked to Helm he understood Helm to say that under the terms of defendant Libson's lease it could handle the line of children's wear. Helm testified, however, that he understood that defendant Libson only wanted to add a line of larger girls' wear, which would overlap junior and misses, and that he did not authorize defendant Libson to add a line of "tots and teens," as he termed the younger girls' line.

Sometime in July 1956, defendant Libson placed a sign in its show window announcing its intention to soon open "A Complete New Childrens Department— Tots to Teens—Ages 3 thru Preteens." Upon seeing the sign plaintiff telephoned Helm and protested against the contemplated sale by defendant Libson of children's wear. Helm then informed defendant Libson that it did not have permission to sell younger children's wear in its store. Defendant Libson removed the sign from its window, but protested that in reliance on the assurance Helm had given it, it had purchased merchandise and fixtures with which to open the new department, and requested defendant Northland to amend its lease so as to permit it to do so.

The record shows that numerous conferences and telephone contacts occurred between the two defendants relative to the question of whether or not defendant Libson's lease would be amended as requested. In brief, defendant Northland appears from the record to have changed its mind several times during the course of these negotiations, first rejecting the request, then indicating that it would grant it, and then reversing itself. The situation was complicated, to some extent, by the fact that defendant Northland had granted May Department Stores Co. an option to purchase its stock, by the terms of which defendant Northland had agreed not to make any lease or other rental agreements without the prior written consent of May Department Stores Company; and by the initial disapproval by the May Company of the requested amendment to defendant Libson's lease.

Defendant Northland's several reversals of its intentions regarding amending defendant Libson's lease seem to have coincided with its changing attitude towards plaintiff's continuing protests to it, and to May Department Stores Company. When defendant Northland reconsidered its initial advice to defendant Libson that it could not sell young children's wear it appears to have recognized plaintiff's objections— but on the grounds that to do so would have been a violation of the use clause of defendant Libson's lease, and not on the grounds that it would have been a violation of plaintiff's lease. Defendant Northland was unhappy about what it regarded as plaintiff's unsatisfactory sales volume, and by plaintiff's failure to sell fabrics and drapes, a right which it had obtained by a subsequent rider to its lease. At one point defendant Northland appeared willing to defer action on defendant Libson's request for an amendment until after the end of 1956 if plaintiff gave up its right to sell textiles. Plaintiff's evidence was that it attempted to surrender this right, but could not reach defendant Northland's responsible officer because that defendant's office was being moved.

In any event, after thus backing and filling, defendant Northland eventually granted, and defendant Libson accepted, a rider to the latter's lease, dated August 24, 1956. To set forth herein the entire document, which covers five typwritten sheets of legal size paper, would unduly lengthen this opinion. It is sufficient to say that basically defendant Libson was granted the right to add to its existing lines " * * * the display and sale of apparel and accessories for young girls within the age range of 3 to 13 * * * " provided that such display and sale were limited to the back 15 feet of the sales area of defendant Libson's store; that the area in which it could display such age 3 to 13 merchandise in its

store windows was expressly limited to a minor fraction of the entire window display area; that little girls' wear, when displayed in the windows, had to be displayed with other merchandise; and defendant Libson was forbidden to create the impression by advertising, window display, or otherwise, that its entire store " * * * or a major part thereof, is devoted to the sale of apparel and accessories for young girls, or that there exists on the whole or any part of the Demised Premises a store engaged primarily in handling clothing or other merchandise for children or young girls."

The amendment also provided that should any final order or decree of a court be entered directed against any act or thing, authorized by the amendment, but not authorized by the original lease, then defendant Libson would comply with the order or decree, and the amendment would be deemed to be amended accordingly; and that " * * * because of the special circumstances which have given rise to these presents * * *", it was agreed that the amendment should be strictly construed in favor of defendant Northland and to the detriment of defendant Libson. There is no doubt, from the record, that the amendment was carefully drawn by defendant Northland's attorneys, with the notices in mind which plaintiff had given to both defendants of its intention to institute legal action if defendant Libson's lease was amended. Defendant Libson's girls' department at its Northland store began operations on or about August 29, 1956, selling a complete line of girls' apparel and accessories from size 3 to preteen 14. The only evidence on the point in the record indicates that defendant Northland strictly complied with the restrictions in the amendment to its lease relating to the amount of space it might use in its show windows for the display of girls' wear, as well as to the clause limiting the area in which it may sell the girls' line to the rear 15 feet of its store. The only exception shown was one instance when about a half dozen little girls' robes were displayed on a counter in the center of the store.

Plaintiff introduced evidence to show that during the last four months of 1956 the gross sales of defendant Libson were $89,714.80, of which $83,076.98 represented sales of misses, junior and women's wear, and only $6,637.82 were of girls' wear. Thus approximately 92.6% of the total sales were of the misses, junior and women's lines and only 7.4% constituted sales of the little girls' line. Plaintiff also introduced evidence to show that the inventory of little girls' wear at the opening of defendant Libson's store in August 1956, was $8,000, at cost, whereas as of January 31, 1957, the inventory cost figure was $2,632.64. As of the latter date the total inventory in defendant Libson's store was $18,124.71, so that the little girls' line represented 14.7% of the total. It was shown that both plaintiff and defendant Libson carried "popular priced" girls' clothing, and that both carried some articles made by the same manufacturer. Harry Lieberman, defendant Libson's president, testified that he hoped to sell $25,000 of girls' wear in 1957, and more in subsequent years. It was his opinion that the addition of the girls' department in defendant Libson's store would not adversely affect plaintiff's business, since it would bring more shopper traffic into the area, which might well result in more business for both.

Harvey Friedman, plaintiff's vice-president, testified to several instances in which customers looked in both plaintiff's windows and defendant Libson's, and then entered that defendant's store; of customers who looked at an item in his store and then remarked that they had better take a look next door before they bought; and of customers who visited the shoe department in his store carrying items purchased at defendant Libson, similar to merchandise he carried. He related that during the last four months of 1956 his sales were $60,713.43, and that though this was an increase of $18,334.91 over the volume of

business done during the corresponding period in 1955, the percentage of increase should have been 50%, or $21,189.26. He also testified that approximately one-half of his expenses for advertising for the months from September 1956, through January 1957, or $1,740.06, were predicated on the fact that defendant Libson was competing with him.

Plaintiff's petition was divided into three counts. In the first, plaintiff alleged that the restrictive covenants of its lease had been breached by the amendment of defendant Libson's lease which permitted that defendant to sell young girls' wear, and prayed for injunctive relief. In count two plaintiff alleged that as the result of the amendment of defendant Libson's lease and the operation by that defendant of its young girls' department, plaintiff had been damaged in the sum of $25,000, for which it prayed judgment. And in the third count plaintiff averred that the various acts of the two defendants were part of a conspiracy to injure and damage plaintiff, by depriving plaintiff of its business, trade, customers, and good will, for which it prayed judgment for actual damages of $25,000 and punitive damages of $50,000. The court below entered judgment enjoining the defendants from selling or permitting the sale in defendant Libson's store of "children's merchandise"; from carrying out the amendment of defendant Libson's lease; and from violating the lease of plaintiff by the operation of a children's store on the premises of defendant Libson; and with respect to counts two and three, entered judgment in favor of the plaintiff and against both defendants for actual damages of $2,000 and punitive damages of $2,000.

Early in the trial plaintiff sought to elicit testimony from Friedman regarding the discussions and negotiations with defendant Northland which had preceded the execution of plaintiff's lease, as well as to introduce in evidence various preliminary drafts of the lease rider relating to a "children's store" which had been the subject of part of such negotiations. Defendants objected, invoking the parol evidence rule. The plaintiff contended below, as it does here, that the word "primarily" as used in the sentence " 'Children's Store' shall be construed as the type of store engaged primarily in handling and offering for sale children's merchandise including but not limited to clothing, shoes, furniture, toys and accessories" is ambiguous. The trial court ruled that it would admit such evidence subject to a motion to strike to be made at the end of the case. All of the defendants' objections to such oral and documentary evidence were subsequently overruled, thereby giving rise, in part, to defendants' first assignment of error.

■ Few rules of evidence have been as widely discussed and interpreted as the parol evidence rule. While variously stated, the general rule is to the effect that parol or extrinsic evidence is not admissible to affect, contradict, vary, modify, add to, or subtract from a written instrument. 32 C.J.S. Evidence § 851; State ex rel. W. L. Morrison Inv. Co. v. Trimble, 301 Mo. 146, 256 S.W. 171; Berberet v. Myers, 240 Mo. 58, 144 S.W. 824. The reason for the rule was well stated in the latter case by Judge Lamm: "When men sit down to put a contract in writing and do so, the presumption is they write all there is of it. All prior or contemporaneous verbal conversations relating to the subject-matter are presumed merged in the writing * * The spoken word flies; the written word remains." 144 S.W. at page 829.

■■ However, in the interests of justice, various exceptions have been made to the stringency of the rule, among them being the corollary that where a written instrument is ambiguous, parol evidence is admissible to ascertain its meaning. Haseltine v. Farmers' Mut. Fire Ins. Co., Mo., 263 S.W. 810, affirming Mo.App., 240 S.W. 815; National Bank of Commerce of

Kansas City, Mo. v. Flanagan Mills & Elevator Co., 268 Mo. 547, 188 S.W. 117. A contract is said to be ambiguous if its terms are susceptible of more than one meaning so that reasonable men may fairly and honestly differ in their construction of them. Interior Linseed Co. v. Becker-Moore Paint Co., 190 Mo.App. 1, 175 S.W. 308, reversed 273 Mo. 433, 202 S.W. 566.

The plaintiff maintains that this is a case in which the foregoing exception, and not the general rule, should be applied; that the word "primarily" as used in the sentence " 'Children's store' shall be construed as the type of store engaged primarily in handling and offering for sale children's merchandise * * *" is ambiguous in that it is an abstract and general word and " * * * provides no rational basis in itself for ascertaining the precise size, nature, volume, sales, purchases, etc., of the space usage prohibited without looking to the intent of the parties as reflected by their negotiations and their acts * * *" and that it was therefore proper to permit the introduction of evidence of the negotiations of the parties leading up to the execution of plaintiff's lease, as well as the prior drafts of the lease. While plaintiff cites many cases in which the courts have permitted the introduction of explanatory parol evidence, only two involve the use of the word "primarily," in Re Ewing's Appeal, Pa., 4 A. 832, and Board of Governors of Federal Reserve System v. Agnew, 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408. A study of the Ewing case will show that in effect the court construed the word, under the facts of that case, to mean "chiefly" or "principally." In the Federal Reserve case the Supreme Court of the United States was asked to pass upon Section 32 of the Banking Act of 1933, 12 U.S.C.A. § 78 which prohibited a partner or employee "primarily engaged" in underwriting securities from serving as an officer, director or employee of a member bank. The evidence showed that the respondents were employees of an investment firm, ranking ninth in 1943 among 94 leading investment bankers, and that its gross income from its underwriting of securities varied from year to year, from 26 per cent to 39 per cent. It is true that in that case the court construed the word "primarily" to mean "substantially." Recognizing that the word "primary" when "applied to a single subject often means first, chief, or principal" (329 U.S. 446, 67 S.Ct. 414) the court pointed out that Section 32 was "directed to the probability or likelihood, based on the experience of the 1920's that a bank director interested in the underwriting business may use his influence in the bank to involve it or its customers in securities which his underwriting house has in its portfolio or has committed itself to take. That likelihood or probability does not depend on whether the firm's underwriting business exceeds 50 per cent of its total business." The court also pointed out that in the same Act, Congress, with reference to those dealing in the underwriting business, had employed the terms "engaged," "primarily engaged," and "principally engaged," and said "The inference seems reasonable to us that Congress by the words it chose marked a distinction which we should not obliterate by reading 'primarily' to mean 'principally.' "

Webster's and other dictionaries define the word "primarily" to mean "in the first place", "pre-eminently," "chiefly," "principally," "essentially," "mainly." It has often been so construed by other courts. Zee v. Gary, 137 Fla. 741, 189 So. 34; Safin v. Jones & Laughlin Steel Corp., 166 Pa.Super. 142, 70 A.2d 703; People ex rel. Breuning v. Berry and Scott Lumber Co., 147 Cal.App.2d 33, 304 P.2d 818; United States v. Bennett, 5 Cir., 186 F.2d 407; Benitez v. Bank of Nova Scotia, 1 Cir., 125 F.2d 523.

We are of the opinion that as used in the rider to plaintiff's lease the word "primarily" was synonymous with "chiefly," "principally," or "mainly," and that it was employed to define a store engaged chiefly

or principally in the sale of children's wear. Its position and purpose in plaintiff's lease supports our view. By the lease proper, plaintiff covenanted and agreed to use the demised premises for the purpose of conducting therein "A children's store defined in Lease Rider No. 1 attached hereto and made a part hereof * * *." By Lease Rider No. 1 defendant Northland agreed that " * * * it will not lease to any other person, firm or corporation any space on the upper level of Building 'B' or 'C' of Northland Shopping Center for use as a children's store." Had the parties stopped at that point it might have been contended that the term "children's store" required clarification, but even then it would be doubtful whether parol evidence as to their prior negotiations would be admissible. Grossenbacher v. Daly, Mo.App., 287 S.W. 781.

■ But the parties went on to define what they meant by the term "children's store"—one principally engaged, as was the plaintiff, in the sale of children's merchandise. Thus the phrase " * * * engaged primarily in handling and offering for sale children's merchandise * * *" was employed in both a descriptive and a restrictive manner; descriptive of the business to be operated by plaintiff, and restrictive in the sense that defendant Northland was prohibited from leasing space to any other tenant on the upper levels of buildings "B" or "D" for "a 'children's store' as above defined." Furthermore, the same lease rider excepted from the restrictive covenant the premises which defendant Northland was permitted to lease for two other children's stores. These were identified in the testimony as Edith's Tots and Teens Shop and the Dan-Dee Shop, both of which, the evidence shows, are not only principally, but exclusively, engaged in selling children's wear. Also, plaintiff's president testified that Famous-Barr Company and ten other stores in the shopping center sold children's wear, and the record shows that he knew there would be other shops in the center handling such merchandise

before plaintiff's lease was executed. And lastly, the record shows that plaintiff, throughout the negotiations preceding the execution of its lease, consulted and had the benefit of the advice of its attorney as to the wording of Lease Rider No. 1. It is difficult to believe that if it had been the intention of the parties to prohibit defendant Northland from leasing space to another tenant to be used to any extent for the sale of children's wear that they would have used the language employed. The very words "engaged primarily" connote the sale of children's wear not only to some degree, but as the principal or first order of merchandise to be sold. We therefore conclude that the evidence regarding the negotiations which preceded the execution of plaintiff's lease, as well as the prior drafts of that document, were not admissible in evidence under the parol evidence rule.

■ The next question presented is whether the evidence demonstrates that under the amendment to its lease defendant Libson is, in fact, operating a children's store, thus breaching the restrictive covenant in plaintiff's lease. Stated another way, did the evidence show that defendant Libson was engaged primarily or principally "in handling and offering for sale children's merchandise." We think not. It was shown that defendant Libson does not handle, and under the restrictive provisions of the amendment to its lease it would not be permitted to handle, boys' wear. It does not sell infants wear younger than age 3. It does sell young girls' wear, between the ages of 3 and 13, thus being in competition with plaintiff in that age group. But by whatever test is applied—store area, inventory, or volume of business—the evidence amply demonstrates that it is not a store principally or chiefly engaged in the sale of even young girls' wear. Only one-tenth of the entire store area is devoted to the young girls' department, and that in the rear part of the store. The display of young girls' merchandise in its store windows has been limited to but one-seventh

of the total window space. Its inventory at the initiation of the young girls' department in August 1956, amounting to about $8,000, was 40% of the store's total inventory as of that date, but this may be explained, at least in part, by the testimony that the largest volume of business in children's wear occurs in the period before the schools open, in September, and before Easter. Plaintiff's evidence further revealed that as of January 31, 1957, the inventory of young girls' wear was only 14.3% of the inventory of the entire store. As to the relative volume of business, in the period from September through December 1956, sales of young girls' wear amounted to $6,637.82, or only 7.4% of the total sales of $89,714.80.

Plaintiff introduced evidence as to the advertising campaign which was conducted in connection with the opening of defendant Libson's young girls' department at its Northland, downtown, and Wellston stores. For about a month prior to the beginning of its operation, defendant Libson distributed blazers or handbills at its Northland store announcing the opening of "a New, Complete Girls Department—'Tots to Teens'—3 to 6x; 7 to 14; 8 to 14." Also, ten spot radio announcements, using three scripts, were broadcast, advertising the addition of the young girls' line to the juniors, misses, and women's line at the three stores. And on one day, August 29, 1956, it inserted a large advertisement in one of the daily newspapers announcing that "Libson's Shop is now a family affair!" and making reference to a " * * * Girls' World!" for " * * * Tots to Teens" at the three stores. None of such advertising matter emphasized the Northland store in any way, and most of it referred to the opening of the young girls' department as an addition to the juniors, misses, and women's lines. In short, it did not create the impression that the three stores handled only young girls' wear, or that such stores were devoted principally to the sale of such merchandise.

In the light of all of the evidence, we believe that the only conclusion which can be drawn is that, as operated up to the time the permanent injunction was entered below, defendant Libson did not operate at the Northland Shopping Center a store principally or chiefly engaged in the selling of children's merchandise. It follows that defendant Northland did not breach plaintiff's lease by permitting defendant Libson to sell young girls' wear in its Northland store.

The final point relates to the finding below that the defendants had engaged in a conspiracy to injure plaintiff, and the award to it of actual and punitive damages. A civil conspiracy has been defined by our Supreme Court as a combination of two or more persons to do by concerted action an unlawful act, or to use unlawful means to do an act which is lawful. Rosen v. Alside, Inc., Mo., 248 S.W.2d 638; Shaltupsky v. Brown Shoe Co., 350 Mo. 831, 168 S.W.2d 1083; Seegers v. Marx & Haas Clothing Co., 334 Mo. 632, 66 S.W.2d 526. The gist of plaintiff's allegation as to the claimed conspiracy is that the defendants conspired to breach plaintiff's lease and to subject plaintiff to competition otherwise barred by its lease, to its damage. The charge thus made is based on the assumption that plaintiff's lease prohibited the defendant Northland from granting to defendant Libson the amendment made of the latter's lease, and that by entering into the amendment the defendants conspired to cause a breach of plaintiff's lease. Since, as we have heretofore pointed out, the plaintiff's lease was not violated by the amendment of defendant Libson's lease, it necessarily follows that plaintiff failed to make a case as to the conspiracy. Rosen v. Alside, Inc., supra; Shaltupsky v. Brown Shoe Co., supra; Seegers v. Marx & Haas Clothing Co., supra.

For the reasons stated the Commissioner recommends that the judgment in favor of plaintiff be reversed.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

The judgment of the Circuit Court of the City of St. Louis in favor of plaintiff is accordingly reversed.

RUDDY, P. J., and WOLFE and ANDERSON, JJ., concur.