The judgment of the United States District Court is affirmed.

---

**UNITED STATES of America, Appellant,**

v.

**Clement F. COOK, Appellee (two cases).**

**UNITED STATES of America, Appellant,**

v.

**Wilfred L. COOK, Appellee (two cases).**

**UNITED STATES of America, Appellant,**

v.

**Wilfred L. COOK and Patricia Cook, Appellees (two cases).**

Nos. 16132, 16145, 16133, 16146, 16134, 16147.

United States Court of Appeals Eighth Circuit.

Oct. 8, 1959.

Carolyn R. Just, Atty., Dept. of Justice, Washington, D. C. (Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson and Louise Foster, Attys., Dept. of Justice, Washington, D. C., Fallon Kelly, U. S. Atty., and Hyam Segell, Asst. U. S. Atty., St. Paul, Minn., were with her on the brief), for appellant.

Joseph A. Maun, St. Paul, Minn. (Jerome B. Simon and Bundlie, Kelley & Maun, St. Paul, Minn., were with him on the brief), for appellees.

Before GARDNER, VOGEL and VAN OOSTERHOUT, Circuit Judges.

VOGEL, Circuit Judge.

These cases, consolidated for the purposes of trial, concern the proper tax treatment to be accorded income resulting from the sale by taxpayers of mink pelts derived from minks culled from their breeding herd. No issues of fact are presented. It is conceded that the business of the taxpayers during the years in question consisted of raising minks for the purpose of selling mink pelts; that this business required the development and maintenance of a breeding herd; that in order to obtain and maintain improved mink strains it was necessary to cull out of the herd minks which were no longer suitable for

use as breeders; that the minks in question had been culled out of the herd for this reason; that they had been held by the taxpayers for more than 12 months prior to their pelting and sale and had been utilized during that time solely for breeding purposes; that there was no market for live, culled breeder minks except as pelts; and that the minks in question were killed and pelted in order to be put in a marketable condition.

The taxpayers reported the income received from the sale of such pelts as gain from the sale of capital assets used in their trade or business under § 117(j) of the Internal Revenue Code of 1939, as amended.[1] The Commissioner of Internal Revenue determined that the taxpayers owed deficiencies on the basis that the proceeds from the sale of these pelts should have been treated as ordinary income. These deficiencies were paid by the taxpayers, who thereafter made timely claims for refunds. Suits were brought in the United States District Court for the District of Minnesota. In Cook v. United States, D.C.Minn.1958, 165 F.Supp. 212, the District Court held that the taxpayers were entitled to the refunds claimed, from which holdings the United States has appealed to this court.

Section 39.117(j)–2 of Treasury Regulations 118 provides that:

"For the purpose of section 117 (j), the term 'livestock' shall be given a broad, rather than a narrow, interpretation and includes cattle, hogs, horses, mules, donkeys, sheep, goats, *fur-bearing animals*, and other mammals. It does not include chickens, turkeys, pigeons, geese, other birds, fish, frogs, reptiles, etc." (Emphasis supplied.)

In view of this regulation, the appellant concedes that the term "livestock" has been extended to include minks raised for commercial purposes. It is claimed, however, that " * * * the Commissioner has properly refused to classify the pelts of such animals as 'livestock'." The Commissioner's position is set forth in Revenue Ruling 57–548, 1957–2 Cum. Bull. 54–55, which, in discussing the corresponding section in the 1954 Internal Revenue Code, explains that—

"when animals are periodically taken from the breeding herd and killed for their pelts, the character of the animals has been changed. They are no longer of the type specified for possible capital gain treatment under section 1231 of the Code and the pelts therefrom constitute property of a kind which would properly be includible in inventory if on hand at the close of the taxable year or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, as is the case where such animals are raised for their pelts, i. e., not for breeding."

1. 26 U.S.C.A. § 117(j) (1):
"*(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.*
"*(1) Definition of property used in the trade or business.* For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in subsection (a) (1) (c). Such term also includes timber or coal with respect to which subsection (k) (1) or (2) is applicable and unharvested crops to which paragraph (3) is applicable. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry."

Thus, the Commissioner claims here that:

" * * * when culled breeding animals are killed and pelted, the product which the taxpayer then has to sell is not of the same character as the culled live animal. Therefore such product is not the type specified by Section 117(j) for capital gain treatment."

And that:

"The privilege of having income taxable at capital gain rates is allowable to the taxpayer here only if he can show that his partnership sold 'livestock' which had been held for breeding purposes, but that requirement can not be met because only pelts from the dead mink were sold. Thus the income involved here, which was realized under exactly the same conditions as the income from those pelts which were admittedly held primarily for sale in the ordinary course of the partnership's business, should be treated exactly like the income from the latter pelts, namely, as ordinary income."

In reaching its conclusion, the court below relied upon this court's decision in Albright v. United States, 8 Cir., 1949, 173 F.2d 339. In that case, taxpayer was a farmer engaged in the production and sale of hogs. In accordance with the customary practice of that business, he annually culled out and sold his entire breeding herd. However, the sale did not occur until after the culled animals had been first allowed to return to "marketable condition". 173 F.2d at page 345. This court held that the proceeds from that subsequent sale qualified for capital gains treatment and, consequently, that the processing for market of the no longer useful breeding hogs did not constitute their being primarily held for sale in the ordinary course of taxpayer's business.

As in the Albright case, the minks here were not marketable immediately upon being removed from the breeding herd and we conclude, similarly, that taking the minimum steps necessary to render them saleable did not change their character within the meaning of section 117(j)(1).

Appellant seeks to distinguish the Albright case on the grounds that it was decided before the addition to section 117(j) (1) of the sentence relating specifically to "livestock". Appellant's present position is that, if the culled minks had been sold *live,* the returns therefrom would qualify under the statute as capital gains, but inasmuch as they were killed and pelted by the taxpayers, the product sold had changed in character and no longer fell within the statutory term and thus constituted a sale in the ordinary course of taxpayers' business.

■ As this court pointed out in Albright, section 117(j) was intended to provide relief for all taxpayers having to sell assets used in their trade or business. Further, it is clear from the legislative history [2] that the addition of the term "livestock" to the section was not intended to limit such relief, but rather to clarify the right of farmers and other animal raisers to it. Finally, it is conceded that there is no market for live culled minks and that their killing and pelting are the minimum steps necessary to make them marketable. Thus, to accept appellant's interpretation of the amendment would be to make meaningless the application of this remedial legislation to taxpayers' business and thereby to negate the clear intent of Congress.

■ We do not think that the term "livestock", as used by Congress and as interpreted by the Treasury Regulations to include "fur-bearing animals", can be said to mean that the animals must be alive when sold. Congress stated that:

" * * * the term 'livestock' in this new sentence should be given a

2. H.Rep. No. 586, 82d Cong., 1st Sess., p. 32 (1951–2 Cum.Bull. 357, 380); S.

Rep. No. 781, 82d Cong., 1st Sess., pp. 41–42 (1951–2 Cum.Bull. 458, 487–488).

broad, rather than a narrow, interpretation; * * *."[3]

The term was used by Congress in not a literal but in a generic sense.

■ But be that as it may, if the property at the time of its acquisition and use could be properly characterized as "*live*stock", then its subsequent conditioning for market by killing and pelting does not remove it from within that term. Appellant would read into the statute the requirement that at the time of sale or disposition, the property must be in the same form or condition as it was when held by the taxpayers for use in their trade or business. Such conditions are not specifically set forth in the statute and we cannot read them in by implication. We think the critical period for characterization of the property goes further back than the time of disposition. The property is properly characterized at the time it is acquired for use by the taxpayers in their trade or business and during the period it is so used. McDonald v. Commissioner, 2 Cir., 1954, 214 F.2d 341, 343. There is no requirement in the statute that the property be used in the trade or business of the taxpayer right up to and including the date of sale or exchange. The statute contemplates and the regulations provide for a reasonable time for disposition after the necessary termination of the property's intended use. Treasury Regulations, Sec. 1.1231–2(b), (c) and Treasury Regulations 118, Sec. 39.-117(j)–2 (b), (c).

In Emerson v. Commissioner, 1949, 12 T.C. 875, 879, the Tax Court, following this court's decision in the Albright case, stated:

> "We also agree with that part of the court's decision wherein it was held that the fact that hogs from the breeding herd were customarily conditioned for market before sale does not show that the taxpayer has not held them for the purpose of breeding or that they were held primarily

for sale to customers in the ordinary course of his trade or business."

Under the undisputed facts in this case, the minks in question, culled from the taxpayers' breeding herd, met every condition of the statute up to the time they were killed and pelted by the taxpayers. We see no reason why the returns from the sale of their pelts should not receive the same treatment as if the minks had been sold live, when the latter was concededly a commercial impossibility.

The appellant cites with approval Kahua Ranch, Ltd. v. United States, D.C. Hawaii 1956, 165 F.Supp. 210. In that case the taxpayer was engaged in the production of beef cattle, as well as in the operation of slaughter houses and the sale of meat. It was there held that proceeds from the sale of cattle, culled from the breeding herd as unproductive and unserviceable and held for more than 6 months, which were slaughtered on the order of local butchers, with taxpayer retaining their hides as payment for the slaughtering, were capital gains; but, that where the culled animals were shipped to and slaughtered at another of taxpayer's establishments and their carcasses stored there in the same manner as other animals and subsequently sold upon demand, the receipts were ordinary income. As Judge Donovan pointed out in his opinion below, in that case there was a market for live slaughter animals. That factor distinguishes the Kahua Ranch case from those at bar. If, in the instant cases, the taxpayers had attempted to condition the minks beyond the first stage of marketability and, as an extreme example, turn the pelts into mink coats, a different situation would arise.

The holdings in Cedarburg Fox Farms, Inc. v. United States, D.C.E.D. Wis., 176 F.Supp. 570, and Edwards v. Commissioner, 6/18/59, 32 T.C. No. 64, support the conclusion herein arrived at.

Affirmed.

3. H.Rep. No. 586, 82d Cong., 1st Sess., p. 32 (1951–2 Cum.Bull. 357, 380).