The **MUNICIPAL BOND CORPORATION**, Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 17721.

United States Court of Appeals Eighth Circuit.

Feb. 18, 1965.

Joseph A. Hoskins of Hoskins, King, Springer, & McGannon, Kansas City, Mo., made argument for petitioner and was on the brief with Charles P. Schleicher and Walter J. Kennedy of Hoskins, King, Springer & McGannon, Kansas City, Mo.

William A. Geohegan, Asst. Deputy Atty. Gen., Tax Division, Dept. of Justice, Washington, D. C., made argument for respondent and filed brief with Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, Washington, D. C.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

The taxpayer, The Municipal Bond Corporation, has filed a timely petition for review of the decision of the Tax Court (opinion reported at 41 T.C. 20) upholding the Commissioner's determination of deficiencies in income tax for the years 1954 to 1958 inclusive aggregating $38,060.08. The deficiency determination is based entirely upon a finding that taxpayer is not entitled to capital gain treatment with respect to gains from sale of real estate made during the 1954 to 1958 period or from installments collected during such years on real estate sale contracts made in prior years.

Since we are reversing the Tax Court's decision for errors of law hereinafter pointed out, no purpose will be served in making an extensive statement of the facts disclosed by the extensive record in this case. The facts are quite fully set out in the Tax Court's opinion.

Taxpayer is a corporation incorporated under the laws of Missouri on October 23, 1924. It files its income tax returns on a calendar year basis. Returns for the years here involved were timely filed with the Collector at Kansas City, Missouri. All real estate sales here involved were reported and tax was paid thereon on the basis that taxpayer was entitled to report the gain as capital gains.

Charles F. Curry has since incorporation been president, director and chief executive officer of the taxpayer. He obtained a controlling stock interest in 1939 and during the taxable years here involved he owned 2063 of the 2310 shares of corporate stock outstanding. The balance of the stock was at least largely owned by members of Mr. Curry's immediate family and nominees.

Taxpayer on December 31, 1945, held fifteen parcels of real estate with a cost of $39,350. On December 21, 1953, it owned twenty-five parcels with a cost of $222,620, and on December 31, 1958, it owned nineteen properties with a cost of $230,311. Taxpayer made nineteen sales of real estate in the involved years. During such period it purchased six additional properties. The Tax Court found, "Petitioner never at any time maintained a sales force or regularly engaged in sales activities. Many of its sales resulted from inquiries made by prospective purchasers." 41 T.C. 20, 22.

The rentals for the years 1954 to 1958 ran from $25,215 to $27,586. The Tax Court found on an overall basis taxpayer's gains from real estate and from rentals were about equal. The average holding period of the properties was four and one-half years.

Taxpayer individually or with members of his immediate family owned a controlling or substantial interest in eight other corporations. Some of these corporations held real estate for rental and investment and others held real estate for resale to customers. One of the corporations was a real estate sales and management agency. Each of the corporations served a legitimate business

purpose. It is not here contended that any of such corporations is only a shell or a sham, nor is it contended that the corporate veil of such corporations should be pierced.

The Tax Court upheld the Commissioner's contention that all gains on sales of real estate during the 1954–58 period as well as installments collected in such years on prior sales were taxable as ordinary income. If capital gains treatment is not available, the correctness of the deficiency determination is not questioned. The principal question here presented as stated by the Commissioner is:

"1. Whether the Tax Court correctly held that the gains from the sale of certain real estate by the taxpayer during the tax years 1954 through 1958, inclusive, and the gains from the sale of certain real estate in prior years, installment payments from which were received during the tax years here involved, were gains from the sale of real estate held primarily for sale to customers in the ordinary course of taxpayer's trade or business within the meaning of Sections 1221 and 1231 of the Internal Revenue Code of 1954, with the result that such gains are taxable as ordinary income rather than as capital gain."

The pertinent provisions of the Internal Revenue Code of 1954 here involved are:

" § 1221. Capital asset defined

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

\* \* \* \* \* \*

" § 1231(b) Definition of property used in the trade or business.— For purposes of this section—

"(1) General rule. The term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

\* \* \* \* \* \*

"(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, \* \* \*."

The corresponding 1939 code provisions are found in § 117(a) and (j), I.R.C.1939.

The Tax Court held that the sales here in controversy did not constitute sales of capital assets within the meaning of the statutes just quoted, upon the ground that such sales came within the exclusion of such statutes since the subject matter of the sales constituted "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

It is conceded that all real estate sold was held more than six months and it is clear that the real estate was held by the taxpayer in its trade or business. Thus, the crucial question presented is whether the Tax Court's determination that the real estate sold was primarily held for sales to customers in the ordinary course of taxpayer's trade or business is clearly erroneous.

■ It is quite true that the clearly erroneous standard of Fed.R.Civ.P. 52 (a) applies to findings of fact made by the Tax Court. However, it is equally clear that findings of fact induced by an erroneous view of the law are not binding upon this court. Greenspon v. Commissioner, 8 Cir., 229 F.2d 947, 949; Marcella v. Commissioner, 8 Cir., 222 F.2d 878, 881.

Taxpayer contends that the Tax Court erroneously interpreted the meaning of the word "primarily" as used in §§ 1221 and 1231 and in support thereof points to the portion of the Tax Court's opinion reading:

"The term 'primarily' as used in the statute has been construed to mean 'substantial.' Rollingwood Corp. v. Commissioner [9 Cir.] 190 F.2d 263; Joseph A. Harrah, 30 T.C. 1236; American Can Co., 37 T.C. 198. This construction permits recognition of the dual purpose concept inherent in some types of business operations. In petitioner's real estate operations, its dual purpose is obvious. Petitioner acquired and held real estate for the dual purpose of both investment and sale to the public. And while the sales purpose, in some instances, may not have been predominant over the investment purpose, it was, nevertheless, substantial throughout the entire period under review. Petitioner's gains from the sale of properties in some years exceeded its gains from all other sources. They were substantial in each of the years involved. On an overall basis the gains from real estate sales and from rentals, petitioner's two principal sources of income, were about equal." 41 T.C. 20, 29.

While the cases cited by the Tax Court in the foregoing quotation lend some support to interpreting the word "primarily" found in the statutes as the equivalent of "substantial", we reject such interpretation.

In United States v. Bennett, 5 Cir., 186 F.2d 407, 411, the court, in interpreting the statutes we are here considering determined that gains from sales of cattle culled from a breeding herd were entitled to capital gains treatment, stated:

"If the statute had been intended to mean what the collector contends for, the word 'primarily' would not have been in it. Since 'primarily' is in the statute, it seems clear to

us that to hold, as the collector contends, that the main, the first, purpose of the keeping of these breeder cattle was for sale, does complete violence to the statute and to its purpose and intent."

In Albright v. United States, 8 Cir., 173 F.2d 339, 344, we found that a capital gain was derived from selling culls from a dairy herd on a consistent basis. We said, "A dairy farmer is not primarily engaged in the sale of beef cattle. His herd is not held primarily for sale in the ordinary course of his business. Such sales as he makes are incidental to his business and are required for its economical and successful management."

In W. R. Stephens Co. v. Commissioner, 8 Cir., 199 F.2d 665, 669, 46 A.L.R.2d 608, we held automobiles assigned to a dealer for his use were held primarily for sale to customers in the ordinary course of business. We discussed the Bennett and Albright cases, supra, stating:

"In those cases it was held, in substance, that livestock acquired by a stock breeder and held for breeding purposes, and not sold until its usefulness for such purposes had passed, was not held 'primarily for sale to customers in the ordinary course of his trade or business.' In those cases, while it appeared that the taxpayer would eventually sell his breeding stock when it ceased to be such, it was shown that his main objective in acquiring and holding the stock was for breeding purposes and not for the purpose of sale."

In Greenspon v. Commissioner, 8 Cir., 229 F.2d 947, and Dillon v. Commissioner, 8 Cir., 213 F.2d 218, we rejected as clearly erroneous the court's determination that the property sold was held primarily for sale to customers in the ordinary course of business.

Gotfredson v. United States, 6 Cir., 303 F.2d 464, 468, involved the issue of capital gain treatment with respect to sales from a dairy herd. The trial court instructed that cattle could be held

**688**

for a dual purpose of carrying on the dairy business and for sale to customers and that if they were held for such dual purpose, the finding should be for the Government. The court reversed, stating: "The trial court in instructing the jury with regard to 'dual purpose' took away from the jury the issue concerning the essential primary purpose for which the appellants herein held the cattle."

The Commissioner, relying upon Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29, urges that the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. The case so holds. The case does not go to the extent of holding that the plain meaning of unambiguous words used in the statute must be disregarded or distorted. In Hanover Bank v. Commissioner, 369 U.S. 672, 687, 82 S.Ct. 1080, 1089, 8 L.Ed. 2d 187, the court quotes and follows the teaching of Crane v. Commissioner, 331 U.S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. 1301, reading, "A firmly established principle of statutory interpretation is that 'the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses.'" And then goes on to say:

> "The statute in issue here, in plain and ordinary language, evidences a clear congressional intent to allow amortization with reference to any call date named in the indenture. Under such circumstances we are not at liberty, notwithstanding the apparent tax-saving windfall bestowed upon taxpayers, to add to or alter the words employed to effect a purpose which does not appear on the face of the statute."

We followed this principle in United States v. Martin, 8 Cir., 337 F.2d 171, 174.

In Yunker v. Commissioner, 6 Cir., 256 F.2d 130, 133, the court, in dealing with the interpretation of the statutes we are here considering but with respect to different words thereof, states:

> "With respect to the interpretation of the statute, the words and phrases, 'trade or business,' 'ordinary' and 'customers' are to be construed in their ordinary and not in an artificially created meaning. Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783. To be engaged in the real estate business means to be engaged in that business 'in the sense that term usually implies.' Dillon v. Commissioner, 8 Cir., 213 F.2d 218, 220."

To like effect, see Austin v. Commissioner, 9 Cir., 263 F.2d 460, 464; see 1 Mertens Law of Federal Income Taxation § 3.01 et seq.

■ The word "primarily" is unambiguous and has a well-recognized and understood meaning. It has been construed in various types of cases of federal and state courts as meaning "of first importance or principally." Benitez v. Bank of Nova Scotia, 1 Cir., 125 F.2d 523 (whether *primarily* engaged in production of poultry so as to be entitled to file bankruptcy as a farmer); McCaughn v. Electric Storage Battery Co., 3 Cir., 63 F.2d 715, 717 (whether storage battery was *primarily* adapted for use in motor vehicles so as to be taxable); Bowles v. Nelson-Ricks Creamery Co., D. Idaho, 66 F.Supp. 885, 888 (whether defendant was a *"primary* wholesaler" under the Emergency Price Control Act); In re Day's Estate, E.D.Ill., 10 F.Supp. 229, 231 (whether bankrupt was engaged *primarily* in farming); Friedman Textile Co. v. Northland Shopping Center, Inc., Mo.App., 321 S.W.2d 9, 15 (whether store was engaged *primarily* in handling and offering for sale children's merchandise as provided in lease); State ex rel. Eveland v. Erickson, 44 S.D. 63, 182 N.W. 315, 317, 13 A.L.R. 1189 (determining *primary* purpose of a building).

Dictionary definitions are in accord. Websters New Int'l Dictionary defines "primary" as first in dignity or importance. Bouvier's Law Dictionary definition is: "That which is first or principal:

as, *primary evidence,* that evidence which is to be admitted in the first instance, as distinguished from secondary evidence, which is allowed only when primary evidence cannot be had."

We find nothing in the statutes as a whole which manifests any intent on the part of Congress to give the word "primarily" any meaning different from its plain, usual and well-understood meaning. It must be assumed that Congress placed such word in the statute for a purpose. The Tax Court, in the interpretation which it made, is reading the word "primarily" out of the statute. In so doing, the court misinterpreted the statute.

Taxpayer also complains that the Tax Court erred in limiting consideration of the taxpayer's purpose of holding the real estate to circumstances existing at the time of sale. The Tax Court did make an ultimate finding reading: "The properties sold by petitioner during the years in question were, *at the time of sale,* held by petitioner primarily for sale in the ordinary course of its trade or business." (Emphasis added.) 41 T.C. 20, 28. In United States v. Cook, 8 Cir., 270 F.2d 725, 729, which involves the question of whether taxpayer was entitled to capital gain treatment on pelts from minks culled from a herd, we said:

> "We think the critical period for characterization of the property goes further back than the time of disposition. The property is properly characterized at the time it is acquired for use by the taxpayers in their trade or business and during the period it is so used. McDonald v. Commissioner, 2 Cir., 1954, 214 F.2d 341, 343. There is no requirement in the statute that the property be used in the trade or business of the taxpayer right up to and including the date of sale or exchange. The statute contemplates and the regulations provide for a reasonable time for disposition after the necessary termination of the property's intended use."

3B Mertens Law of Federal Income Taxation, § 22.138, pp. 628–29, states:
> "If the taxpayer's situation is examined at the very moment the property is sold, it will invariably be found that there was an intent to sell, but such a literal approach would nullify the statutory provisions conferring capital gain or loss treatment, and would seem to go beyond the legislative intent behind the exclusion involved."

■ Doubtless the purpose for which the property was acquired, the purpose for which it was held, as well as the motive at the time of sale and the method of sale are among the factors to be considered in resolving the issue. Ordinarily, no one factor is conclusive and the question of intention or purpose is largely one of fact. Broughton v. Commissioner, 6 Cir., 333 F.2d 492, 495; Frankenstein v. Commissioner, 7 Cir., 272 F.2d 135.

■ The Commissioner insists the Tax Court's decision is not based upon the challenged finding above set out but that proper consideration has been given to all relative factors. There is support in the opinion as a whole for such contention. We would be reluctant to reverse upon the "time of sale" asserted error standing alone. However, inasmuch as this case is to be remanded, we emphasize that the Tax Court in making its findings should not limit its consideration solely to circumstances existing at the time of sale.

A full and careful consideration of the Tax Court's findings and opinion as a whole, convinces us that at least with respect to some of the property sold the Court's decision may be predicated upon its erroneous interpretation of the word "primarily".

■ We also observe the taxpayer's purpose of holding property may vary with respect to different tracts. Upon the capital gain issue, purpose or intention must be determined with respect to each tract and such purpose may vary

with respect to the different tracts. Margolis v. Commissioner, 9 Cir., 337 F.2d 1001; Wood v. Commissioner, 5 Cir., 276 F.2d 586, 590; 3B Mertens Law of Federal Income Taxation § 22.139.

 It is the function of the Tax Court, not this court, to find the facts. However, such findings must be based upon proper legal standards. We shall cite a few excerpts from the Tax Court opinion for the purpose of showing that the Court's findings were induced by failing to give the word "primarily" its proper interpretation:

One property was sold to a church of which Mr. Curry was a member. As to this, the Tax Court found, "Officials of the church selected the site and requested Curry to arrange for its purchase from petitioner. The property had not previously been offered for sale by petitioner." 41 T.C. 20, 25.

With respect to the sale of a property to Kansas City Power & Light Co., the Court states: "The sale of property and right-of-way to Kansas City Power & Light Co. was initiated by representatives of the company. Petitioner made the sale reluctantly and with knowledge of the power of the utility to acquire the property by condemnation." 41 T.C. 20, 26.

Another tract was sold to the school district for school purposes. The purchase was instigated by the school board which had a right to condemn.

A tract adjoining American Red Cross property was sold to the Red Cross. As to this, the court said: "Petitioner had never previously offered the property for sale or contemplated selling it. During petitioner's ownership of the property, 1947–54, it had produced rentals of $5,830." 41 T.C. 20, 25.

Speaking of a number of relevant sales, the Tax Court observes: "The low cost rental properties which comprised a substantial portion of petitioner's real estate holdings were usually sold when they required extensive repairs or when the sale values exceeded the rental values. Undeniably, they were held for sale after they were deemed unsuitable for rental." 41 T.C. 20, 29. This last situation would appear to resemble the sale of culls from the livestock herds in the cases hereinabove discussed.

Taxpayer about 1940 had acquired a 240 acre tract called Blue Valley by purchase of tax certificates from which tax deed was acquired, and later to clear title a deed from the former owner was obtained. The total cost of this property was about $80 an acre. Eighty-seven acres of this land adjoined the Frisco Railroad. The Tax Court recites that the taxpayer envisioned developing this land as a commercial park in which it might construct buildings for lease or sale to industries and that it sought help in financing such projects from the railroad, and other institutions. Later, after extended negotiations, an arrangement was worked out whereby the railroad leased the land for ten years with option to renew for 89 years at an annual rental of $100 an acre, with an option to the railroad to purchase any part at $4,000 per acre. The option was placed in the lease at the insistence of the railroad and the option price was at a figure in excess of the market value. Several of the sales here involved resulted from the railroad exercising its option to purchase portions of the tract.

We again call attention to the portion of the Tax Court's opinion heretofore quoted wherein it stated, "And while the sales purpose, in some instances, may not have been predominant over the investment purpose, it was, nevertheless, substantial throughout the entire period under review." 41 T.C. 20, 29. This statement in and of itself leads us to believe that the Tax Court did not base its findings and decision on a determination of the primary or predominant purpose of taxpayer in acquiring and holding the various properties.

No purpose will be served in attempting to analyze the evidence with respect to all the properties here involved. We express here no view as to the facts but remand the case to the Tax Court for findings based upon the standards here-

inabove set forth with respect to each property.

■ Taxpayer urges that the Tax Court erred in admitting evidence over its objection and denying its motion to strike with respect to evidence offered as to activities of other corporations in which Mr. Curry had a substantial interest. Some of such evidence was doubtless proper and other portions of the evidence might well have been properly excluded. We do not believe prejudicial error has here been established. We have repeatedly held that in cases tried to a court without a jury prejudicial error in receiving incompetent evidence will not be found unless it is affirmatively shown that such evidence induced the court to make a finding which would not otherwise have been made. Lessmann v. Commissioner, 8 Cir., 327 F.2d 990, 996–97, and cases there cited.

■ We do observe that under the record here it appears that taxpayer is a separate and distinct corporate entity and no basis has been shown for piercing the corporate veil. Hence, it is our view that the operations of the other corporations would have no probative force in establishing taxpayer's purpose of holding real estate except to the extent that it might be shown that the other corporations were acting as an agent for the taxpayer. See Frank v. Commissioner, 8 Cir., 321 F.2d 143, 150; Kaltreider v. Commissioner, 3 Cir., 255 F.2d 833, 838.

■ In the Tax Court, taxpayer with respect to installments on sales made in prior years urged that the Commissioner is estopped from changing his position. The Commissioner had accepted capital gain treatment of the installment sales in prior years. The Tax Court properly rejected the estoppel defense and taxpayer is not asserting error here with respect to such ruling. The taxpayer however does insist that upon the basis of the facts, it is entitled to capital gain treatment on the sale installments collected in the involved years, and in our view is entitled to have a fact

determination made with respect to the installment sales.

This case is reversed and remanded to the Tax Court for further proceedings consistent with the views expressed in this opinion. ·